**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**John R. SWAIM, Defendant-Appellant.**

No. 84–4583.

United States Court of Appeals,
Fifth Circuit.

April 10, 1985.

Rehearing Denied May 13, 1985.

Battaglia, Ross, Hasting, Dicus & Andrews, Stephen J. Wein, Anthony S. Bat-

**1532**

taglia, Petersburg, Fla., for defendant-appellant.

Glen H. Davidson, U.S. Atty., Thomas W. Dawson, Asst. U.S. Atty., Oxford, Miss., for plaintiff-appellee.

Before RUBIN, RANDALL, and HIGGINBOTHAM, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The defendant was convicted by a jury of concealing and covering up the true purchase price of a building, $1,600,000, by a scheme in order to obtain a loan from a government insured institution, in violation of 18 U.S.C. § 1001. The Government sought to prove that the purpose of the defendant's deception was to obtain a loan of $2,225,000, which included an amount in excess of the purchase price, and to convert the excess to his personal use. On appeal, the defendant contends that the evidence was insufficient to establish either his concealment of the actual purchase price or that the actual price, if concealed, was material to his receipt of the loan. He argues that the facts at worst establish that he submitted a false statement, not that he concealed a material matter, and that the indictment, which charged other offenses of which the jury acquitted him, was multiplicitous. Finding no merit in these contentions, we affirm the judgment of conviction.

## I.

Construed most favorably to the government, as the contradictory testimony must now be,[1] the evidence might reasonably be understood to show the following. John Swaim, a real estate developer, lived in Florida and, in addition to his Florida interests, operated property in Virginia and New York. He met Dr. Joseph Villard, a Louisiana resident, who had contracted to purchase the stock of the North Mississippi Savings & Loan Association (the Association), but who lacked the funds to complete the purchase.

Swaim, Villard, and Malcolm Reese, President of the Association, agreed that three loans would be made from financial institutions controlled by Villard to companies controlled by Swaim. The proceeds of the loans were then to be returned to Villard to enable him to purchase the Association's stock by a deadline beyond which Villard would have been forced to pay a severe penalty. The loans were executed on April 12, 1982, and Villard purchased the Association's stock by the deadline. Both Reese and Villard pleaded guilty to one or more counts in the indictment, which charged them with fraud, false statements, and conspiracy to violate various statutes related to federally insured savings and loan institutions. The jury acquitted Swaim on these charges, which are mainly related to the loans made in April.

Swaim also planned to purchase a building located in Treasure Island, Florida, for $1,600,000. A regulation governing the Association, which is not further identified in the record, forbade it to lend an amount in excess of 80% of either the appraised value of the property or its purchase price, whichever was less. Swaim, Villard, and Reese met to discuss a loan from the Association to Swaim's corporation in the amount of $2,225,000, which was to be secured by the Treasure Island building. Villard instructed Reese to make the loan to Swaim. An escrow agent in Florida closed the loan after the Association wired the loan proceeds, minus the Association's fee, to Florida.

The escrow agent sent the Association the usual loan documents, including a copy of the contract for the purchase of the Treasure Island building, but no closing statement. The contract was signed by Swaim and stated that the true purchase price of the building was $1,600,000. This document was placed in the Association's

---

1. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942); *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc).

file. Reese testified that he asked the escrow agent for a closing statement, but the agent told him that it had not prepared one. Reese then requested a closing statement from Swaim. Shortly thereafter, Swaim sent Reese an undated, unsigned closing statement showing the purchase price of the building to be $2,600,000. If the price of the Treasure Island building were $2,800,000, the Association would not violate the regulation, which was apparently concededly applicable, by making a loan of approximately $2,225,000. If, however, the purchase price were either $2,600,000 or $1,600,000, the regulation would have been violated by a loan of $2,225,000, although the lower the price the more egregious the violation. Swaim's secretary testified that she prepared this loan closing statement on his direct instructions and that all information contained in the document, including the false purchase price, was furnished by Swaim. Swaim admitted that he had furnished this statement, but claimed that he did so only on Reese's insistence.

Part of the proceeds of the loan, $1,600,000, was used to purchase the Treasure Island building. At the closing of the sale and loan, Swaim instructed the closing agent to disburse the net excess over the purchase price, some $612,000, to a mortgage company, presumably to satisfy a loan on the property. Swaim then forged the mortgage company's endorsement on the check and converted the funds.

In a Federal Home Loan Bank Board examination of the Association, the examiner discovered Swaim's false loan closing statement and the sale contract and brought the discrepancy between the purchase price in each to Reese's attention. Reese testified that he telephoned Swaim and questioned him about the price and that Swaim admitted that he had purposely concealed the true purchase price because, if the true purchase price had been known, he feared the Association would not have made the loan. The examiner later requested and received from the escrow agent a copy of the actual closing statement. Even this statement, however, did not reveal that Swaim was to have been the ultimate recipient of the $612,000 loaned in excess of the purchase price. While there was other testimony that contradicted Reese's, his credibility was clearly a jury question.

## II.

Under 18 U.S.C. § 1001, it is a crime, in any matter within the jurisdiction of any department or agency of the United States, to conceal or cover up a material fact by any trick, scheme, or device.[2] The elements of an offense under the concealment portion of the statute are: (1) knowingly and willfully; (2) concealing and covering up by trick, scheme, or device; (3) a material fact; (4) in any matter within the jurisdiction of a department or agency of the United States.[3]

Swaim does not contend that his actions were not knowing or willful, or that the alleged material matter was not within the jurisdiction of an agency of the United States. Swaim's use of the false loan closing statement to document and justify the $2,225,000 loan amount, his causing the "true" closing statement to carry a camouflaged disbursement hiding his conversion of the $612,000 overage to his own use, and his admission to Reese that he had willfully concealed the true purchase price from the Association in order to get a loan larger than the purchase price were sufficient to allow the jury to conclude that he had concealed and covered up the true purchase price by trick, scheme, and device.

---

**2.** 18 U.S.C. § 1001 reads in pertinent part:
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly or willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact ... shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**3.** See *United States v. Markham,* 537 F.2d 187, 194 (5th Cir.1976); *United States v. Diogo,* 320 F.2d 898, 902 (2d Cir.1963); *see also United States v. London,* 550 F.2d 206, 210–14 (5th Cir.1977); *cf. United States v. Smith,* 523 F.2d 771, 779 n. 15 (5th Cir.1975).

Swaim's protestation to the contrary is but an attempt to reargue the facts, selecting only those favorable to his position. Such an argument may be appropriate for the jury. It lacks savor on appeal, for we may reverse the conviction only if "a reasonably minded jury must necessarily have entertained a reasonable doubt of the defendant's guilt." [4] The evidence adduced on the concealment issue is sufficient to avoid reversal under this standard.

■ Swaim also contends that the false closing statement was not material because the loan was not made in reliance on that statement and because a copy of the purchase contract, which stated the correct purchase price of the Treasure Island building, was in the file with the false closing statement. This argument, however, is contrary to our previous construction of the statute:

> The charge of materiality requires only that the fraud in question have a natural tendency to influence, or be capable of affecting or influencing, a government function. The alleged concealment or misrepresentation need not have influenced the actions of the government

agency, and the government agents need not have actually been deceived. [5]

The Government does not have to show actual reliance on false statements or documentation. [6] "A statement may be material even if it is ignored or never read by the agency receiving the misstatement." [7] The concealment "must simply have the capacity to impair or pervert the functioning of a government agency." [8] The effect on the federal agency need not be direct, however, for "the ultimate authority to see that the federal funds are properly spent" provides "the necessary link between deception of the non-federal agency and effect on the federal agency." [9]

■ In this circuit, "[m]ateriality rests upon a factual showing by the prosecution.... The determination is, however, a question of law for the court, ... and therefore subject to complete review, unrestricted by the 'clearly erroneous' standard." [10] Although the charge submitted to the jury on count eleven did not instruct the jury that the purchase price of the building was a material fact and left that inference to the jury,[11] Swaim does not

---

4. *United States v. Lorence,* 706 F.2d 512, 518 (5th Cir.1983); *see also United States v. Del Aguila-Reyes,* 722 F.2d 155, 157 (5th Cir.1983).

5. *United States v. Markham,* 537 F.2d 187, 196 (5th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977).

6. *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980); *see also United States v. Diaz,* 690 F.2d 1352, 1357-58 (11th Cir.1982).

7. *United States v. Diaz,* 690 F.2d 1352, 1358 (11th Cir.1982) (citing *United States v. McIntosh,* 655 F.2d 80, 83 (5th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1450, 71 L.Ed.2d 662 (1982)).

8. *United States v. Lichenstein,* 610 F.2d 1271, 1278 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

9. *United States v. Baker,* 626 F.2d 512, 514 n. 5 (5th Cir.1980).

10. *United States v. Lichenstein,* 610 F.2d 1272, 1278 (5th Cir.1980) (citations omitted); *see also United States v. Winkle,* 587 F.2d 705, 713 (5th

Cir.1979). *But see United States v. Irwin,* 654 F.2d 671, 677 n. 8 (10th Cir.1981).

11. The jury charge on count eleven recites the language of the indictment and then states:

> Three essential elements must be proved beyond a reasonable doubt in order to establish the offenses charged under counts five, nine and eleven. They are:
> *First,* the concealing or covering up by any trick, scheme or device of a material fact;
> *Second,* the doing of such act or acts knowingly and willfully and,
> *Third,* that the material fact concealed and covered up, related to a matter within the jurisdiction of a department or agency of the United States.

Later in the jury instructions, after the charge on counts twelve and thirteen, the instructions quote 18 U.S.C. § 1001, and instruct the jury that the "Federal Home Loan Bank Board and its arm, the Federal Savings and Loan Insurance Corporation is [*sic*] an agency of the United States and has [*sic*] jurisdiction to make examinations and to require information ... from insured savings and loan institutions." The charge then defines "insured institution" and instructs the jury that the "fact that the insured ... association's books and records do

contend this was an error, but argues only that the testimony produced by the prosecution at trial is insufficient to support a finding by any fact-finder that the purchase price was a material fact. After reviewing the record, we find that the prosecution produced sufficient testimony to support the conclusion that the purchase price was a material fact.

In its presentation of its case in chief, the prosecution called the Vice President and Supervisory Agent of the Federal Home Loan Bank of Dallas to testify about the materiality of the purchase price of the building. This witness testified that the Federal Home Loan Bank requires savings and loan institutions to consider the sale price of property before making a loan and that federal regulations require that the loan not exceed a certain percentage of the appraisal or sale price of the property, whichever is less. He further testified that the purchase price is material to his agency in determining whether the loan was properly underwritten and safe and sound, or, if unsound, the effect on the financial solvency of the institution. According to this testimony, the concealment of the true purchase price of the building would "have the capacity to impair or prevent the functioning of a government agency." [12] Contrary to Swaim's argument, therefore, this case is readily distinguishable from *United States v. Beer*,[13] in which we reversed the defendant's conviction because the functioning of the federal agency involved would not have been impaired had the agency relied on the defendant's statement.[14]

Swaim contends, however, that the government failed to produce evidence that the false closing statement was material to the granting of the loan, and, additionally, that the closing statement had no potential to subvert the agency's function because the sales contract, which recites the true purchase price, was placed in the file prior to the closing of the loan. In his first claim, Swaim apparently seeks to have us determine materiality on the basis of whether the Association relied on the closing statement. The relevant test of materiality, however, looks to whether the statement had the capacity to impair the functioning of a government agency, not the Association.[15] Swaim's second argument suffers partly from the same misconception. It also implies, however, the preposterous conclusion that, when one file contains both a statement concealing a material fact and evidence of the criminal concealment, the evidence that is at least partly necessary for proof of the criminal violation destroys the materiality of the concealment. We are unwilling to accept the proposition that the concealment, when bungled or clearly revealed by an attendant document, is any less a crime. Such an exception to materiality swallows the requirement and misconstrues its purpose—"to exclude 'trivial' falsehoods from the purview of the statute." [16] That the statement was undated and unsigned contributes to, rather than detracts from, its capacity to pervert the agency's function. Moreover, to accept, as the jury apparently did, Reese's testimony that Swaim admitted his deliberate concealment of the purchase price shows that Swaim recognized that the concealment of the price was essential for the

---

not reflect the *true recipients* of loan proceeds is a fact material to examination of such institution by the Federal Savings and Loan Insurance Corporation." (Emphasis added.)

Because the pages of the jury charge were not originally numbered it is unclear whether the court meant for any of the later instructions to relate to the charge on count eleven. It is clear, however, that the court did not decide the issue of the materiality of the *purchase price*.

**12.** *United States v. Lichenstein*, 610 F.2d 1272, 1278 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

**13.** 518 F.2d 168 (5th Cir.1975).

**14.** *Id.* at 172.

**15.** *See United States v. Lichenstein*, 610 F.2d 1272, 1278 (5th Cir.), *cert. denied*, 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

**16.** *United States v. Beer*, 518 F.2d 168, 170 (5th Cir.1975).

granting, if not the documentation, of the loan.

■ The jury's acquittal of Swaim on the related conspiracy charge, in which the loan for the purchase of the Treasure Island building is mentioned as one of the overt acts, may be logically inconsistent with the verdict of guilty on the substantive concealment count, but juries in criminal cases are free to render verdicts on the conspiracy and the underlying felony counts that are inconsistent or even the result of mistake or compromise.[17] Each count must be considered separately, and, if the verdict is supported by evidence, it may stand.[18] As the Supreme Court most recently reiterated, "where truly inconsistent verdicts have been reached, '[t]he most that can be said ... is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'"[19] Moreover, the jury may simply have given Swaim the benefit of the doubt regarding the alleged joint criminal activity prior to the Treasure Island loan, but may have had no doubt that he concealed the true purchase price for that loan in filing the false closing statement.

### III.

■ The indictment did not improperly charge Swaim with concealment merely because the evidence also would have supported his conviction for submitting a false statement. So long as there is "an affirm-ative act by which means a material fact is concealed,"[20] an indictment for concealment is proper. "Concealment and falsity were bound together in context here[, and] the proof bore out the charge."[21] The evidence supported the jury's verdict on the charge, and that is sufficient.

### IV.

■ "Multiplicity" is the charging of a single offense in more than one count.[22] "The test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not.[23] Moreover, "[w]hether a continuous transaction results in the commission of but a single offense or separate offenses ... is determined by whether separate and distinct prohibited acts, made punishable by law, have been committed."[24] Counts five, seven, nine, and eleven of the indictment each charge violation of the same statute, but on the basis of separate loans made either on different dates or at different financial institutions. Elements and facts of each substantive count are different from those in all other counts charged under the same statute, and each count recites a separate and distinct prohibited act. The counts, therefore, are not multiplicious. Even if a single fact pattern were present, the "different evidence test," which requires proof of different facts and different elements as to each separate of-

---

17. See *United States v. Powell,* —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984); *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358 (1932); *United States v. Dudley,* 581 F.2d 1193, 1199 (5th Cir.1978).

18. *United States v. Lichenstein,* 610 F.2d 1272, 1279 (5th Cir.1980) (quoting *United States v. Romeros,* 600 F.2d 1104, 1105 (5th Cir.1979)), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980).

19. *United States v. Powell,* —— U.S. ——, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (quoting *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356, 358 (1932)).

20. *United States v. London,* 550 F.2d 206, 213 (5th Cir.1977).

21. *United States v. Markham,* 537 F.2d 187, 193 (5th Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977).

22. *United States v. Free,* 574 F.2d 1221, 1224 n. 3 (5th Cir.), *cert. denied,* 439 U.S. 873, 99 S.Ct. 209, 58 L.Ed.2d 187 (1978).

23. *Id.* at 1224 (quoting *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932)).

24. *United States v. Shaid,* 730 F.2d 225, 231 (5th Cir.1984).

fense,[25] would show that the counts in question are not multiplicitous.

Finally, in view of the jury's verdict of guilty on one count under § 1001 and acquittal of Swaim on the remaining counts charging a violation of that statute, the principal "evil" complained of has been rendered moot. The chief danger raised by a multiplicious indictment is the possibility that the defendant will receive more than one sentence for a single offense. The jury verdict removed that possibility.[26] The second danger is the adverse psychological effect on the jury prejudicing the defendant from the repetition of detail of a single course of conduct.[27] In this case, the counts in which Swaim "was charged contained simple and direct averments .... There was no threat of generating an adverse psychological effect on the jury." [28]

For these reasons the judgment is AFFIRMED.

**25.** See United States v. Horsley, 519 F.2d 1264, 1265 (5th Cir.1975); United States v. Hill, 500 F.2d 733, 740 (5th Cir.1974).

**26.** See United States v. Hearod, 499 F.2d 1003, 1005 (5th Cir.1974); see also United States v. Lentz, 624 F.2d 1280 (5th Cir.1980).

**27.** See United States v. Hearod, 499 F.2d 1003, 1005 (5th Cir.1974).

